**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| BUMBLE TRADING, INC. and BUMBLE HOLDING, LTD., | § § § | |
| Plaintiffs/Counter-Defendants, | § § | C.A. No. 3:18-cv-02578-K |
| VS. | § § | |
| MATCH GROUP, LLC, | § § | |
| Defendant/Counter-Plaintiff. | § § | |

**DEFENDANT MATCH GROUP, LLC'S FIRST AMENDED COUNTERCLAIMS**
**AGAINST BUMBLE HOLDING, LTD AND BUMBLE TRADING, INC.**

**I.      THE PARTIES**

1.      Match Group, LLC ("Match") is a Delaware Corporation with a principal place of business in Dallas, Texas at 8750 N. Central Expressway, Suite 1400.

2.      Bumble Trading, Inc. is a Delaware Corporation with a principal place of business in Austin, Texas.

3.      Bumble Holding, Ltd. is a corporation existing under the laws of the United Kingdom with a principal place of business in London, United Kingdom.

**II.      JURISDICTION AND VENUE**

4.      This Court has personal jurisdiction over Bumble Trading, Inc. and Bumble Holding, Ltd.[1] because those entities filed this lawsuit in Dallas County.

5.      This Court has jurisdiction over Match's patent infringement counterclaims pursuant to § 1454, § 1441, § 1331 and § 1338.  The Court has jurisdiction over Match's

---

[1] As used in this document, reference to "Bumble" should be understood to include by Bumble Trading, Inc. and Bumble Holding, Ltd., unless referring to the Bumble app itself.

counterclaims for declaratory judgments of non-tortious interference and non-business

disparagement pursuant to § 1331 and/or § 1367.  The Court has jurisdiction under § 1367 over

Match's counterclaim for a declaratory judgment seeking a declaration that all disputes arising

from Match's contemplated acquisition of Bumble should be litigated in England and Wales and,

in the alternative, for no liability for fraud, misappropriation of trade secrets, unfair competition,

or promissory estoppel.

6.    Subject to Match's arguments concerning the exclusive forum selection clause in

the non-disclosure agreement between Match Group, Inc. and Worldwide Vision, Ltd., venue

will be proper in the Northern District of Texas because Bumble initiated this action in Dallas

County and the removal statute therefore provides for venue in this Court.  *See* 28 U.S.C.

§§ 1390(c); 1441(a); 1454(a).

III.    FACTUAL ALLEGATIONS

A.    The Creation of Tinder

7.    The Tinder app was first conceived at and created by "Hatch Labs," a technology

incubator owned by Match's ultimate parent company, IAC/InterActiveCorp ("IAC").  Sean

Rad, Justin Mateen, Jonathan Badeen, Joe Munoz, Chris Gulczynski, Whitney Wolfe-Herd, and

others formed the early Tinder team that conceived, designed, developed, and conducted initial

marketing efforts for the Tinder app.

8.    Chris Gulczynski's position at Tinder was "Lead Designer" or "Chief Creative."

Gulczynski was integral in designing the general look and feel of the earliest iterations of the

Tinder app.

9.    Whitney Wolfe-Herd's position with Tinder was "Vice President of Marketing."

She assisted in promoting the app and encouraging users to sign up in the app's early days.

10.    Sarah Mick joined Tinder in 2013, after Tinder's initial launch.  Mick's title was

"Vice President of Design" and she assisted Gulczynski on various design aspects of the Tinder interface.

11.    First released in September 2012 for iPhone devices, Tinder revolutionized online dating services. From its earliest days, the premise of Tinder has been fundamentally the same. Tinder users are shown other users ("potential match(es)") based on certain parameters, including age range and geographic location. The user is shown a card with a photo of a potential match nearby. The user is then given a choice to indicate interest (or lack thereof) in the potential match merely by swiping the card right (if interested) or left (if not). Although the earliest iterations of Tinder did not include the ability to swipe left or right, once implemented, swiping on Tinder became a cultural sensation.

12.    Tinder is now one of the most popular apps in the world.

**B.    Match's Tinder-Related Intellectual Property**

13.    Match has been awarded a utility patent, U.S. Patent No. 9,733,811 (the "'811 Patent"), entitled "Matching Process System and Method," in connection with the functional innovations embodied in versions of the Tinder app. The '811 Patent is attached as Exhibit A.

14.    Match has been awarded a utility patent, U.S. Patent No. 9,959,023 (the "'023 Patent"), entitled "Matching Process System and Method," in connection with other functional innovations embodied in versions of the Tinder app. The '023 Patent is attached as Exhibit B.

15.    Match has also been awarded numerous design patents related to ornamental aspects of the Tinder app. One such patent, United States Patent No. D798,314 (the "'314 Patent"), entitled "Display Screen or Portion Thereof with a Graphical User Interface of a Mobile Device," issued September 26, 2017. The '314 Patent is attached hereto as Exhibit C.

**FIRST COUNTERCLAIM:  DECLARATORY JUDGMENT OF INFRINGEMENT AND INFRINGEMENT OF THE '811 PATENT**

16.     Match incorporates by reference the preceding paragraphs as if fully set forth herein.

17.     There is an actual controversy between Match and Bumble in light of Bumble's petition alleging that Match's allegations of infringement of the '811 Patent amounted to tortious interference because they were frivolous and made in bad faith.

18.     Bumble Holding, Ltd. and Bumble Trading, Inc. directly infringe the '811 Patent by making and using a system that practices the claims of Tinder's patent.

19.     Claim 1 of the '811 Patent claims:

A computer implemented method of profile matching, comprising:

electronically receiving a plurality of user online-dating profiles, each profile comprising traits of a respective user and associated with a social networking platform;

electronically receiving a first request for matching, the first request electronically submitted by a first user using a first electronic device;

determining a set of potential matches from the plurality of user online-dating profiles for the first user in response to receiving the first request;

causing the display of a graphical representation of a first potential match of the set of potential matches to the first user on a graphical user interface of the first electronic device, the first potential match corresponding to a second user;

determining that the first user expressed a positive preference indication regarding the first potential match at least by determining that the first user performed a first swiping gesture associated with the graphical representation of the first potential match on the graphical user interface;

in response to determining that the first user expressed the positive preference indication regarding the first potential match, automatically causing the graphical user interface to display a graphical representation of a second potential match of the set of potential matches instead of the graphical representation of the first potential match;

determining that the second user has expressed a positive preference indication regarding the first user after determining that the first user expressed the positive

preference indication regarding the first potential match;

determining to enable initial communication between the first user and the second user in response to determining that both the first user has expressed the positive preference indication regarding the second user and the second user has expressed the positive preference indication regarding the first user;

in response to determining to enable initial communication between the first user and the second user, causing the graphical user interface to display to the first user the graphical representation of the first potential match;

determining that the first user expressed a negative preference indication regarding a third potential match of the set of potential matches at least by determining that the first user performed a second swiping gesture associated with a graphical representation of the third potential match on the graphical user interface, the second swiping gesture different than the first swiping gesture, the third potential match corresponding to a third user;

preventing communication between the first user and the third user after determining that the first user has expressed the negative preference indication regarding the third user;

determining that the first user expressed a positive preference indication regarding a fourth potential match of the set of potential matches at least by determining that the first user performed the first swiping gesture associated with a graphical representation of the fourth potential match on the graphical user interface, the fourth potential match corresponding to a fourth user; and

preventing communication between the first user and the fourth user after determining that the fourth user has expressed a negative preference indication regarding the first user.

20.    Claim 4 of the '811 Patent claims:

A non-transitory computer-readable medium comprising instructions that, when executed by a processor, are configured to:

electronically receive a plurality of user online-dating profiles, each profile comprising traits of a respective user and associated with a social networking platform;

electronically receive a first request for matching, the first request electronically submitted by a first user using a first electronic device;

determine a set of potential matches from the plurality of user online-dating profiles for the first user in response to receiving the first request;

5

cause the display of a graphical representation of a first potential match of
the set of potential matches to the first user on a graphical user interface of
the first electronic device, the first potential match corresponding to a
second user;

determine that the first user expressed a positive preference indication
regarding the first potential match at least by determining that the first user
performed a first swiping gesture associated with the graphical
representation of the first potential match on the graphical user interface;

in response to the determination that the first user expressed the positive
preference indication regarding the first potential match, automatically
cause the graphical user interface to display a graphical representation of a
second potential match of the set of potential matches instead of the
graphical representation of the first potential match;

determine that the second user has expressed a positive preference
indication regarding the first user after determining that the first user
expressed the positive preference indication regarding the first potential
match;

determine to enable initial communication between the first user and the
second user in response to the determination that both the first user has
expressed the positive preference indication regarding the second user and
the second user has expressed the positive preference indication regarding
the first user;

in response to the determination to enable initial communication between
the first user and the second user, cause the graphical user interface to
display to the first user the graphical representation of the first potential
match; determine that the first user expressed a negative preference
indication regarding a third potential match of the set of potential matches
at least by determining that the first user performed a second swiping
gesture associated with a graphical representation of the third potential
match on the graphical user interface, the second swiping gesture different
than the first swiping gesture, the third potential match corresponding to a
third user;

prevent communication between the first user and the third user after
determining that the first user has expressed the negative preference
indication regarding the third user;

determine that the first user expressed a positive preference indication
regarding a fourth potential match of the set of potential matches at least
by determining that the first user performed the first swiping gesture

6

associated with a graphical representation of the fourth potential match on the graphical user interface, the fourth potential match corresponding to a fourth user; and

prevent communication between the first user and the fourth user after determining that the fourth user has expressed a negative preference indication regarding the first user.

21.    Claim 7 of the '811 Patent claims:

A system for profile matching, comprising:

an interface operable to:

electronically receive a plurality of user online-dating profiles, each profile comprising traits of a respective user associated with a social networking platform;

electronically receive a first request for matching, the first request electronically submitted by a first user using a first electronic device; and

a processor coupled to the interface and operable to:

determine a set of potential matches from the plurality of user online-dating profiles for the first user in response to receiving the first request;

cause the interface to display a graphical representation of a first potential match of the set of potential matches to the first user on a graphical user interface of the first electronic device, the first potential match corresponding to a second user;

determine that the interface has received a positive preference indication from the first user regarding the first potential match at least by determining that the first user performed a first swiping gesture associated with the graphical representation of the first potential match on the graphical user interface;

automatically cause the interface to remove the presentation of the first potential match from the graphical user interface in response to detecting the gesture and cause the interface to present, on the graphical user interface, a second potential match of the set of potential matches to the first user;

determine that the second user has expressed a positive preference indication regarding the first user after determining that the first user expressed the positive preference indication regarding the first

potential match; and

determine to enable initial communication between the first user and the second user in response to the determination that both the first user has expressed the positive preference indication regarding the second user and the second user has expressed the positive preference indication regarding the first user;

in response to the determination to enable initial communication between the first user and the second user, cause the graphical user interface to display to the first user the graphical representation of the first potential match;

determine that the first user expressed a negative preference indication regarding a third potential match of the set of potential matches at least by determining that the first user performed a second swiping gesture associated with a graphical representation of the third potential match on the graphical user interface, the second swiping gesture different than the first swiping gesture, the third potential match corresponding to a third user;

prevent communication between the first user and the third user after determining that the first user has expressed the negative preference indication regarding the third user;

determine that the first user expressed a positive preference indication regarding a fourth potential match of the set of potential matches at least by determining that the first user performed the first swiping gesture associated with a graphical representation of the fourth potential match on the graphical user interface, the fourth potential match corresponding to a fourth user; and prevent communication between the first user and the fourth user in response to determining that the fourth user has expressed a negative preference indication regarding the first user.

22.     Bumble Holding, Ltd. is the listed distributing company for the Bumble app on the Apple App Store and the Google Play Store.  Bumble Trading, Inc. also markets and distributes the Bumble app.  Thus, Bumble Holding, Ltd. and Bumble Trading, Inc. are directly infringing the '811 Patent by making and/or using the Bumble system.

23.    In at least one version of the Bumble app,[2] Bumble Holding and Bumble Trading's servers practice all of the limitations of these claims, as set forth in the example below. For example, Bumble's servers electronically receive a plurality of user online-dating profiles, each profile comprising traits of a respective user and associated with a social networking platform.  When a Bumble app user downloads and initially accesses the application, the user device is required to set up a Bumble account that is associated with the user's Facebook account:



24.    Through the account setup process, Bumble receives from each user an online profile comprising traits of respective users.  For example, as of March 15, 2018, the Frequently Asked Questions on Bumble's website indicated that Bumble "use[s] Facebook to help build your profile by importing your name, age, school, and/or occupation."  Today, Bumble's FAQs "suggests using Facebook to help build your profile by importing your name, age, etc."

25.    Bumble's servers also perform the step of electronically receiving a first request for matching, the first request electronically submitted by a first user using a first electronic device.  For example, after authorizing his or her Facebook account, the Bumble user is taken to

---

[2] Bumble has recently redesigned its user interface.  The analysis contained in this claim relates to the prior version of the app.  To the extent there are differences relevant to infringement related to the new version of the Bumble app, Match will address those differences during the course of serving infringement contentions, at the latest.

the screen where he or she can indicate positive and negative preferences for various potential matches. At a point before those potential matches are shown, Bumble has received a request for matching.

26.     Bumble's servers also perform the step of determining a set of potential matches from the plurality of user online-dating profiles for the first user in response to receiving the first request. In response to receiving the parameters set forth in the request for matching contained in the Bumble app user request, Bumble determines a set of potential matches for the requesting user based on parameters such as location, age, and gender:



27.     Bumble's servers also perform the step of causing the display of a graphical representation of a first potential match of the set of potential matches to the first user on a graphical user interface of the first electronic device, the first potential match corresponding to a second user. Bumble causes the display of potential matches of other Bumble app users to appear on the first Bumble app user's graphical user interface. The potential matches shown correspond with the determination of potential matches described in [¶ 26] above:



28.      Bumble's servers also perform the step of determining that the first user expressed a positive preference indication regarding the first potential match at least by determining that the first user performed a first swiping gesture associated with the graphical representation of the first potential match on the graphic user interface.  A Bumble app user may affirmatively select (or reject) another Bumble app user by swiping gestures.  Bumble makes a determination based on this Bumble app user indication (e.g., swipe right or swipe left).  Bumble determines whether a first Bumble app user has made a positive preference indication in the form of a first swiping gesture:



29.      Bumble's servers also perform the step of, in response to determining that the first

user expressed the positive preference indication regarding the first potential match, automatically causing the graphical user interface to display a graphical representation of a second potential match of the set of potential matches instead of the graphical representation of the first potential match. After determining that the first Bumble app user has expressed a positive preference via a swiping gesture (swipe right), Bumble automatically presents a second potential match:



30.    Bumble's servers also perform the step of determining that the second user has expressed a positive preference indication regarding the first user after determining that the first user expressed the positive preference indication regarding the first potential match. Bumble compares the selected preference of each potential match (i.e., of a first Bumble app user and a second Bumble app user), including making a determination whether the first Bumble app user and the second Bumble app user each expressed a positive preference for each other.

31.    Bumble's servers also perform the step of determining to enable initial communication between the first user and the second user in response to determining that both the first user has expressed the positive preference indication regarding the second user and the

second user has expressed the positive preference indication regarding the first user.

32.     In the event that the determination described in the immediately preceding paragraph results in a mutual positive preference indication, Bumble determines to enable initial communication between the first Bumble app user and the second Bumble app user.  In the same-gender case, either participant may communicate.  In an opposite-gender case, Bumble makes the determination to enable initial communication by allowing the female user to message the male user.

33.     Bumble's servers also perform the step of, in response to determining to enable initial communication between the first user and the second user, causing the graphical user interface to display to the first user the graphical representation of the first potential match.  For example, upon determining that mutual positive preference gestures have been made, Bumble presents the following graphical representation of the first potential match:



34.     Bumble's servers also perform the step of determining that the first user expressed a negative preference indication regarding a third potential match of the set of potential matches at least by determining that the first user performed a second swiping gesture associated with a graphical representation of the third potential match on the graphical user interface, the second swiping gesture different than the first swiping gesture, the third potential match corresponding

to a third user.  Bumble determines whether the first Bumble app user expressed a negative

preference for a third Bumble app user by determining whether the first Bumble app user swiped

left:



35.     Bumble's servers also perform the step of preventing communication between the

first user and the third user after determining that the first user has expressed the negative

preference indication regarding the third user.  For example, if the first Bumble app user

expressed a negative preference for a third Bumble app user, the Bumble app will not allow the

first and third Bumble app users to communicate through the app.

36.     Bumble's servers also perform the step of determining that the first user expressed

a positive preference indication regarding a fourth potential match of the set of potential matches

at least by determining that the first user performed the first swiping gesture associated with a

graphical representation of the fourth potential match on the graphical user interface, the fourth

potential match corresponding to a fourth user.  A Bumble user may affirmatively select (or

reject) another Bumble app user by swiping gestures.  Bumble makes a determination based on

this Bumble user indication (i.e., swipe right or swipe left).  Bumble determines whether a first

Bumble app user has made a positive preference indication in the form of a first swiping gesture.

37.    Finally, Bumble's servers perform the step of preventing communication between the first user and the fourth user after determining that the fourth user has expressed a negative preference indication regarding the first user.  Upon a determination that a fourth Bumble app user expressed a negative preference for a first Bumble app user, Bumble will prevent communication between those users.

38.    At least some servers perform this method in the United States.

39.    Bumble Holding, Ltd. and Bumble Trading, Inc. indirectly infringe the '811 Patent by inducing infringement by others, such as end-user customers, by, for example, encouraging and instructing end-user customers to install and use the Bumble app in the United States.

40.    Bumble Holding, Ltd. and Bumble Trading, Inc. took the above actions intending to cause infringing acts by others.

41.    Bumble was also aware of the '811 Patent.  For example, on a February 7, 2018 earnings call, Match Group, Inc. CEO Mandy Ginsberg discussed the '811 Patent.

42.    That same day, the online publication Axios indicated that it had reached out to Bumble for a comment about the '811 Patent.

43.    Additionally, it was well-publicized that Tinder was seeking a patent related to its swipe functionality.  For example, a June 22, 2015 article in Adweek indicated that Tinder was prosecuting a patent related to swipe functionality.

44.    Moreover, Whitney Wolfe-Herd, Chris Gulcznyski, and Sarah Mick were all still at Tinder when the application maturing into the '811 Patent was filed in October 2013.

45.    Bumble also has admitted knowledge of the '811 Patent at least by suing Match

for making allegations concerning the patent.

46.     If Bumble did not know that the actions it encouraged constituted infringement of the '811 Patent, Bumble nevertheless subjectively believed there was a high probability that others would infringe the '811 Patent but took deliberate steps to avoid confirming that it was actively inducing infringement by others.

47.     Bumble also indirectly infringes the '811 Patent by contributing to infringement by others, such as end-users, by providing within the United States software components for operating Bumble's app and interacting with the servers associated with Bumble's app.  These software components are, for example, the Bumble app, and the download package that contains the Bumble app for interacting with Bumble's servers.  Bumble's end-users directly infringed the '811 Patent by, for example, installing and using the Bumble app in the United States to use the Bumble system in the United States and Bumble servers in the United States.  These software components are known by Bumble to be especially made or adapted for use in Bumble's infringing system.

48.     Bumble has known these components to be especially made or especially adapted for use in infringement of the '811 Patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use.  Alternatively, Bumble subjectively believed there was a high probability that these components were especially made or especially adapted for use in an infringement of the '811 Patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use but took deliberate steps to avoid confirming the same.

49.     Bumble's infringement of the '811 Patent is and has been willful.  Bumble at a minimum knew or had reason to know of certain facts which would lead a reasonable person to

16

realize their actions were unreasonably risky with respect to infringement of the '811 Patent. For example, as discussed above, Bumble is and has been aware of the '811 Patent. Bumble designed its app to mirror Tinder and its swipe functionality specifically to compete with Tinder and avoid a barrier to entry in the market by mimicking Tinder's swipe functionality in connection with an online matchmaking app.

## SECOND COUNTERCLAIM:  DECLARATORY JUDGMENT OF SUBJECT MATTER ELIGIBILITY OF THE '811 PATENT.

50.     In its petition, Bumble alleges that the '811 Patent is "facially invalid" for allegedly failing to recite subject matter eligible for patenting.

51.     There is an actual controversy between Match and Bumble in light of Bumble's petition alleging that the '811 Patent is invalid.

52.     The inventions claimed in the '811 Patent are not directed to an abstract idea. Instead, the claims are directed to an improvement in computer and user interface functionality as well as in online social networking.

53.     Specifically, the inventors of the continuation-in-part aspect of the '811 Patent set out to improve the user interface functionality in dating and other matchmaking apps. The use of a swipe on a graphical representation of a user to denote positive and of a different swipe on the graphical representation to denote negative, in connection with a mutual opt-in matchmaking app, was a non-conventional, concrete improvement in how touch screen user interfaces interact with users sifting through and making binary choices, such as indicating positive or negative preferences related to potential matches. Although the general gesture of swiping may have been known in the prior art, the specific application to a graphical representation of a user in the specific matchmaking context claimed, in order to make binary choices expressing a preference or lack thereof regarding potential matches, was unknown and unconventional.

54.     This interface improvement allows users to sift through more information, more quickly than previous interfaces addressing similar binary choice user decisions.  These efficiencies to user interaction revolutionized the world of online dating.

55.     Scroll-based interfaces were prevalent and ubiquitous in the online dating world at the time of the inventions claimed in the '811 Patent.

56.     Although these interfaces were generally fine for their intended purposes, they suffered from drawbacks.

57.     For example, many users feel like scrolling can be difficult, particularly when scrolling on devices with small screens.

58.     Additionally, scroll-based systems tend to hinder the ability to show large photographs.  In the dating context, many users believe that viewing photographs of potential matches is one of the most significant aspects of making preference decisions.

59.     The innovations claimed in the CIP aspects of the '811 patent solve these problems by providing an improved, non-scroll-based interface thereby fostering more binary choice decisions and increased user engagement with the application.

60.     The innovations do this by describing the one-at-time, dragging-gesture based interface claimed in the '811 Patent.

61.     By requiring profiles to be viewed one-at-a-time, the interface precludes users from deferring preference choices, which enables the system to obtain additional preferences concerning users than it might otherwise.

62.     Further, by allowing preference indications to be received by virtue of a dragging-gesture known in the patent as a "swipe," the interface minimizes user movement, thus also fostering user engagement and more potential matches to be made.

63.     In the wake of Tinder's release, multiple third-party publications lauded Tinder's innovative card-based format.

64.     For example, a public project published in connection with a class at Davidson College describes Tinder's card-based interface as "[t]he most important and innovating [*sic*] aspect of the design of Tinder."  It further contrasts the interface as "an alternative to the traditional scrolling interface" and describes various advantages of the Tinder interface to scroll-based interfaces.  For example, it describes that "Tinder requires extremely little movement from its user in order to function" and that it "require[s] far less effort than other interfaces, which makes it more appealing to its users," which is particularly advantageous "[i]n a culture where speed and ease are paramount."  The article goes on to describe Bumble as "almost identical" to Tinder and recognized that "[t]he fact that Bumble is almost identical to Tinder displays the genius of Tinder's concept and design."  *See* Ex. D.

65.     In another 2015 article from growthhackers.com, the author praised Tinder's "novel user experience," and "novel interface and interaction design."  The author acknowledged that "the way Tinder is built has everything to do with how it caught fire."  It describes "the big difference between Tinder and other mobile apps is how you navigate through potential matches. Matches are presented like a virtual deck of cards that the user 'swipes' through," noting that the interface makes it "easy to do with one hand, making it perfect for moving quickly" while also providing "more screen real estate . . . for large pictures and more information," which "isn't feasible in a list format or on a small screen with lots of navigation options."  *See* Ex. E.

66.     In 2017 article from innovationiseverywhere.com, describing Tinder's rise to success, Tinder's user interface was described as what "was different" from competitor applications at the time.  The article further describes that "Tinder's UI simplified the selection

process of finding potential suitors to a binary option . . . .  Unlike other dating apps that require the user to plough through cumbersome lists, Tinder required only an input that registered as a 'Yes' or 'No' from the user."  *See* Ex. F.

67.     That the inventions are directed toward new computer-specific user interface technology is confirmed by the surrounding limitations.  The inventions claim a specific computer method, system, and computer-readable medium of matchmaking where parties are not permitted to communicate unless and until a match is made, user profiles are specifically "online-dating profiles" and those profiles must be "associated with a social networking platform," a type of platform that is itself computer-specific.  The claims further describe various actions of a graphical user interface that provide certain information at certain times in response to certain types of inputs.  This is not conventional post-solution activity in order to monopolize an abstract idea of matchmaking or even mutual opt-in matchmaking.  Instead, these limitations recite a particularly advantageous computer embodiment of a matchmaking process that also solves computer-specific problems related to the ease of creating fake accounts and profiles, the inconvenience of filling out profiles, and the problem of certain online dating users being inundated with messages.  This particularly advantageous online matchmaking method may have been known prior to the inventions claimed.  However, this method was not so pervasive as to be "conventional."

68.     Moreover, even if that matchmaking method was conventional, the inventions are directed to an improved interface for that method.

**THIRD COUNTERCLAIM:  DECLARATORY JUDGMENT OF INFRINGEMENT AND INFRINGEMENT OF THE '314 PATENT**

69.     Match incorporates by reference the preceding paragraphs as if fully set forth herein.

70. There is an actual controversy between Match and Bumble in light of Bumble's petition alleging that Match's allegations of infringement of the '314 Patent amounted to tortious interference because they were frivolous and made in bad faith.

71. The '314 Patent claims an ornamental aspect of Tinder's app design related to swiping left or right on cards containing photographs.

72. The '314 Patent claims the ornamental design shown in Figures 1 and 2 of that patent:

 

FIG. 1                    FIG. 2

73. As the patent makes clear, only the solid lines illustrate the ornamental design claimed. The broken lines are for illustrative purposes only.

74. In at least one version of the Bumble app,[3] Bumble infringes on this ornamental design.

75. Bumble Holding infringes this design patent at least by making the design in the

---

[3] Bumble has recently redesigned its user interface. The analysis contained in this claim relates to the prior version of the app. To the extent there are differences relevant to infringement related to the new version of the Bumble app, Match will address those differences during the course of serving infringement contentions, at the latest.

United States by distributing the software code that generates the design on a user device, by using the design in the United States via promotional materials, and by using the design in the app to sell services related to the app.

76.     Specifically, Bumble's app includes an ornamental design where photographic cards are swiped left or right, as shown below:

 

77.     The resemblance between the two apps is such as to deceive an ordinary observer into believing that Bumble's design is the same as Match's patented design.

78.     Bumble has actual notice of the '314 Patent.  Chris Gulczynski, a co-founder of Bumble and Bumble's former Chief Product Officer, is a named inventor on the patent from his time at Tinder.  Gulczynski previously assigned his rights to the patent (and all other relevant intellectual property) to Match.

79.     Bumble's infringement of the '314 Patent is and has been willful.  Bumble at a minimum knew or had reason to know of certain facts which would lead a reasonable person to realize their actions were unreasonably risky with respect to infringement of the '314 Patent.  Specifically, Bumble, at least because of its relationship with Chris Gulczynski, who designed

aspects of the user interfaces of both Tinder and Bumble, knew that the ornamental design

claimed in the '314 Patent was likely infringed by Bumble's substantially identical card swipe

ornamental design in the Bumble app.

80.    Additionally, Bumble has been aware of the '314 Patent before the filing of this

lawsuit, at least as of when Match filed its complaint against Bumble Trading and as of when

Bumble Holding and Bumble Trading sued Match for allegations made in that complaint.

## FOURTH COUNTERCLAIM: DECLARATORY JUDGMENT OF NON-FUNCTIONALITY OF THE '314 PATENT

81.    In its petition, Bumble alleges that the '314 Patent is "invalid[]" because it is

"primarily functional rather than ornamental."

82.    There is an actual controversy between Match and Bumble in light of Bumble's

petition alleging that the '314 Patent is invalid.

83.    The '314 Patent is not invalid for reciting functional subject matter.

84.    The ornamental expression of swiping on cards containing photographs at an

angle is plainly different than a claim reciting the functionality of all swipe right and swipe left

actions on an interface.

## FIFTH COUNTERCLAIM: DECLARATORY JUDGMENT OF INFRINGEMENT AND INFRINGEMENT OF THE '023 PATENT

85.    Match incorporates by reference the preceding paragraphs as if fully set forth

herein.

86.    In at least one version of the Bumble app,[4] Bumble directly infringes the '023

Patent at least by making and using a system that practices the claims of Tinder's patent.

---

[4] Bumble has recently redesigned its user interface.  The analysis contained in this claim relates
to the prior version of the app.  To the extent there are differences relevant to infringement
related to the new version of the Bumble app, Match will address those differences during the
course of serving infringement contentions, at the latest.

87.    For example, independent claim 3 of the '023 Patent recites:

A system, comprising:

an interface operable to:

present a graphical representation of a first item of information of a
plurality of items of information, the first item of information comprising
a graphical representation of a first online dating profile associated with a
first user, wherein the interface is further operable to present the graphical
representation of the first item of information of the plurality of items of
information as a first card of a stack of cards;

a processor coupled to the interface and operable to:

detect a gesture associated with the graphical representation of the first
item of information, the gesture corresponding to a positive preference
indication associated with the first item of information, the positive
preference indication associated with the first item of information
comprising an expression of approval for the first user associated with the
first online dating profile, wherein the processor is further operable to
detect a right swiping direction associated with the gesture;

store the positive preference indication associated with the first item of
information in response to detecting the gesture; and

the interface further operable to:

automatically present a graphical representation of a second item of
information of the plurality of items of information in response to the
processor detecting the gesture, the second item of information comprising
a graphical representation of a second online dating profile associated with
a second user; and

automatically remove the graphical representation of the first item of
information in response to detecting the gesture.

88.    Bumble Holding, Ltd. is the listed distributing company for the Bumble app on

the Apple App Store and the Google Play Store.  Bumble Trading, Inc. also markets and

distributes the Bumble app.  Thus, Bumble Holding and Bumble Trading are directly infringing

the '023 Patent by using the Bumble app in the United States and by distributing the Bumble app

to end users in the United States.

89.    A user device running the Bumble app comprises the claimed system.  The

Bumble app comprises an interface. When in operation, the app presents a graphical representation of a first item of information of a plurality of items of information, the first item of information comprising a graphical representation of a first online dating profile associated with a first user. Specifically, the app presents a graphical representation of a first online dating profile at least by showing a picture of a user associated with an online dating profile:



90.    Bumble's interface is further operable to present the graphical representation of the first item of information (i.e., the graphical representation of the online dating profile) as a first card of a stack of cards. Specifically, Bumble's graphical interface presents dating profiles in a stacked, card-based format:



91.    User devices compatible with the Bumble app include processors.

92.    When the Bumble app is downloaded and installed, those processors are operable to detect a gesture associated with the graphical representation of the first item of information, the gesture corresponding to a positive preference indication associated with the first item of information, the positive preference indication associated with the first item of information comprising an expression of approval for the first user associated with the first online dating profile.  Specifically, when the Bumble app is operating on a device, it detects a gesture—a right swiping gesture—performed on the graphical representation of the online dating profile to indicate a positive preference for the user associated with that profile:



93.    As shown above, the code comprising the Bumble app, when downloaded,

installed, and operating on a user device renders the device's processor operable to detect a right swiping direction associated with the positive preference indication gesture.

94.    The code comprising the Bumble app also renders the device's processor operable to store that positive preference indication associated with the first item of information in response to detecting the gesture.  Specifically, after the app detects that a user has swiped right on the graphical representation of the dating profile, it stores data in memory indicating a positive preference before transmitting that data to Bumble's servers.

95.    Bumble's app also comprises an interface that automatically presents a graphical representation of a second item of information of the plurality of items of information in response to the processor detecting the gesture, the second item of information comprising a graphical representation of a second online dating profile associated with a second user.  In the Bumble app, in response to the processor detecting the positive indication gesture, the Bumble app automatically presents the entire graphical representation of a second online dating profile associated with a second user:

 

96.    As shown above, the Bumble app also automatically removes the graphical

representation of the first item of information in response to detecting the gesture.

97.     Bumble also indirectly infringes the '023 Patent by inducing infringement by others, such as end-user customers, by, for example, encouraging and instructing end-user customers to install and use the Bumble app in the United States.

98.     Bumble took the above actions intending to cause infringing acts by others.

99.     If Bumble did not know that the actions it has encouraged and continues to encourage constitute infringement of the '023 Patent, Bumble nevertheless subjectively believes there was and is a high probability that others have and will infringe the '023 Patent but has taken and is taking deliberate steps to avoid confirming that it is actively inducing infringement by others.

100.    Bumble also indirectly infringes the '023 Patent by contributing to infringement by others, such as end-users, by providing within the United States software components for operating Bumble's app.  These software components are, for example, the Bumble app, and the download package that contains the Bumble app.  Bumble's end-users directly infringed the '023 Patent by, for example, installing and using the Bumble app in the United States to use the Bumble system in the United States.  These software components are known by Bumble to be especially made or adapted for use in Bumble's infringing system.

101.    Bumble has known these components to be especially made or especially adapted for use in infringement of the '023 Patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use.  Alternatively, Bumble subjectively believes there was and is a high probability that these components were especially made or especially adapted for use in an infringement of the '023 Patent and that these components are not a staple article or commodity of commerce suitable for substantial non-

infringing use but has taken and is taking deliberate steps to avoid confirming the same.

102.    Bumble's infringement of the '023 Patent is and has been willful at least as April 30, 2018 and the filing of Match's First Amended Complaint in *Match, LLC v. Bumble Trading, Inc.*, 18-cv-0080 (W.D. Tex.).  At that point, Bumble at a minimum knew or had reason to know of certain facts which would lead a reasonable person to realize their actions were unreasonably risky with respect to infringement of the '023 Patent.   And Bumble designed its app to mirror Tinder and its swipe functionality specifically to compete with Tinder and avoid a barrier to entry in the market by mimicking Tinder's swipe functionality in connection with an online matchmaking app.

## SIXTH COUNTERCLAIM:  DECLARATORY JUDGMENT THAT THE '023 PATENT IS SUBJECT MATTER ELIGIBLE.

103.    The inventions claimed in the '023 Patent are not directed to an abstract idea. Instead, the claims are directed to an improvement in computer and user interface functionality as well as in online social networking.

104.    Specifically, the inventors of the continuation-in-part aspect of the '023 Patent set out to improve the user interface functionality in online dating apps.  Far from claiming the general concept of matchmaking or even mutual opt-in matchmaking on a computer or over the Internet, the '023 Patent recites a new, innovative interface design that reflects a non-conventional, concrete improvement in graphical interfaces for online dating.

105.    For example, claim 3 recites multiple specific, concrete aspects related to an improved interface.  The claim requires that the graphical representation of a dating profile be represented as the first card of a stack of cards, that the system be operable to detect a gesture corresponding to a positive preference indication of the dating profile, that the interface be operable to detect a right swiping direction associated with that positive preference gesture, that

29

a graphical representation of a second online dating profile is automatically presented in response to detecting the positive preference gesture, and that the graphical representation of the first data profile is automatically removed.

106.    As with the '811 Patent, the requirements of this claim reflect a non-conventional, concrete improvement in how touch screen user interfaces interact with users sifting through and making binary choices.  Even if the general gesture of swiping was known in the prior art, the specific application of a right swipe gesture to indicate a positive preference on a card-based online dating interface was unknown and unconventional and provides specific, concrete improvements to the interface.

107.    This interface improvement allows users to sift through more information, more quickly than previous interfaces addressing similar binary choice user decisions.  These efficiencies to user interaction revolutionized the world of online dating.

108.    Scroll-based interfaces were prevalent and ubiquitous in the online dating world at the time of the inventions claimed in the '023 Patent.

109.    Although these interfaces were generally fine for their intended purposes, they suffered from drawbacks.

110.    For example, many users feel like scrolling can be difficult, particularly when scrolling on devices with small screens.

111.    Additionally, scroll-based systems tend to hinder the ability to show large photographs.  In the dating context, many users believe that viewing photographs of potential matches is one of the most significant aspects of making preference decisions.

112.    The innovations claimed in the CIP aspects of the '023 patent solve these problems by providing an improved, non-scroll-based interface by fostering more binary choice decisions and increased user engagement with the application.

113.    The innovations do this by describing the one-at-time, dragging-gesture based interface claimed in the '023 Patent.

114.    But requiring profiles to be viewed one-at-a-time, the interface precludes users from deferring preference choices, which enables the system to obtain additional preferences concerning users than it might otherwise.

115.    Further, by allowing preference indications to be received by virtue of a dragging-gesture known in the patent as a "swipe," the interface minimizes user movement, thus also fostering user engagement and more potential matches to be made.

116.    In the wake of Tinder's release, multiple third-party publications lauded Tinder's innovative card-based format.

117.    For example, a public project published in connection with a class at Davidson College describes Tinder's card-based interface as "[t]he most important and innovating [*sic*] aspect of the design of Tinder."  It further contrasts the interface as "an alternative to the traditional scrolling interface" and describes various advantages of the Tinder interface to scroll-based interfaces.  For example, it describes that "Tinder requires extremely little movement from its user in order to function" and that it "require[s] far less effort than other interfaces, which makes it more appealing to its users," which is particularly advantageous "[i]n a culture where speed and ease are paramount."  The article goes on to describe Bumble as "almost identical" to Tinder and recognized that "[t]he fact that Bumble is almost identical to Tinder displays the genius of Tinder's concept and design."  *See* Exhibit D.

118.    In another 2015 article from growthhackers.com, the author praised Tinder's "novel user experience," and "novel interface and interaction design."  The author acknowledged that "the way Tinder is built has everything to do with how it caught fire."  It describes "the big difference between Tinder and other mobile apps is how you navigate through potential matches. Matches are presented like a virtual deck of cards that the user 'swipes' through," noting that the interface is "easy to [use] with one hand, making it perfect for moving quickly" while also providing "more screen real estate . . . for large pictures and more information," which "isn't feasible in a list format or on a small screen with lots of navigation options."  *See* Exhibit E.

119.    In a 2017 article from innovationiseverywhere.com, describing Tinder's rise to success, Tinder's user interface was described as what "was different" from competitor applications at the time.  The article further describes that "Tinder's UI simplified the selection process of finding potential suitors to a binary option . . . .  Unlike other dating apps that require the user to plough through cumbersome lists, Tinder required only an input that registered as a 'Yes' or 'No' from the user."  *See* Exhibit F.

## SEVENTH COUNTERCLAIM: DECLARATORY JUDGMENT OF NON-TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS.

120.    In its original State Court Petition, Bumble alleges Match tortiously interfered with prospective business relations by filing a lawsuit in the Western District of Texas and making public statements about that lawsuit.  Bumble further alleges that Match filed that lawsuit and made these statements "with conscious desire to prevent an investment of Bumble from occurring, and to interfere with Bumble Holding's right to freely dispose of its assets."

121.    As support for Bumble's claim, Bumble alleges that Match Group's assertion of intellectual property against Bumble are "bogus" and "frivolous."

122.     Bumble made these allegations not because there is any legitimate basis for asserting them, but because Bumble needed to make such allegations in an attempt to plead the minimum level of conduct to support its chosen claim.  However, good faith assertions of legal rights cannot serve as a legal basis for a tortious interference counterclaim except in a very limited set of circumstances.

123.     Specifically, Bumble is required to plead and prove not merely that Match Group alleged intellectual property violations once the prospects of a reasonable acquisition price became unlikely.  It must plead and prove that Match Group's entire lawsuit is a "sham."

124.     In other words, Bumble must plead and prove more than that it thinks Match Group's Western District of Texas lawsuit is ultimately incorrect.  It must plead and prove that the lawsuit is both *objectively baseless* and brought in *subjective bad faith*.

125.     Bumble cannot do so.  Despite its exceedingly high burden to show that Match's entire lawsuit is objectively baseless, Bumble did not even attempt to dismiss six of the nine claims alleged against it in the Western District Action—despite its allegations that all but one of these claims was frivolous.  This alone dooms any showing that Match's lawsuit is a "sham."

126.     Even if only one "objectively baseless" claim could support a tortious interference claim in this context, Bumble still could not possibly meet its high burden because no legitimate set of facts can make it plausible, much less establish, that any claim in Match's lawsuit is objectively baseless or brought in subjective bad faith.

127.     In any event, Match did not file the Western District of Texas lawsuit to attempt to acquire Bumble for a below-market price or interfere with Bumble's valuation in any illegitimate way.  It did so because Match should not be forced to compete against its own ideas that are protected by enforceable intellectual property rights.

128.    Match denies that it "acted intentionally and with conscious desire to prevent an investment of Bumble from occurring, and to interfere with Bumble Holding's right to freely dispose of its assets."

129.    Match denies that it undertook any tortious action that proximately caused injury to Bumble.

130.    Match denies that it engaged in any action with specific, malicious intent to cause substantial injury to Bumble.

131.    Although Bumble has sought to dismiss this claim voluntarily under Rule 41, Bumble has informed Match that it may, or it may not, file the same claim against Match again at some other time.

132.    This is precisely the situation the Declaratory Judgment Act is designed for. Match believes Bumble's allegations are totally and utterly baseless.  And Match will not simply wait until Bumble decides whether or not it wants to pursue these claims—likely in connection with Bumble's next media blitz.  Match intends to litigate these baseless allegations now, and Match intends to conclusively disprove them.

## NINTH COUNTERCLAIM: DECLARATORY JUDGMENT OF NO BUSINESS OR COMMERCIAL DISPARAGEMENT.

133.    In its original State Court Petition, Bumble also alleged that Match Group committed "business and commercial disparagement" by "publish[ing] false or disparaging information about Bumble."  The only allegation of anything allegedly "false" or "disparaging" is "statements in the press falsely claiming that Bumble infringed Match's intellectual property, as well as false statements in the [Western District of Texas] lawsuit."

134.    As factual support for Bumble's claim, Bumble elsewhere alleges that Match Group's assertions of intellectual property against Bumble are "bogus" and "frivolous."

135.    Again, Bumble made these allegations not because there is any legitimate basis for asserting them, but because Bumble needed to make such allegations in an attempt to plead the minimum level of conduct to support its chosen claim.  However, good faith assertions of legal rights cannot serve as a legal basis for a commercial and business disparagement claim except in a very limited set of circumstances.  Specifically, as with the tortious interface count described above, Bumble is required to plead and prove not merely that Match Group alleged intellectual property violations after the prospects of a reasonable acquisition price became unlikely.  It must plead and prove that Match Group's lawsuit is an entire "sham."

136.    In other words, Bumble must plead and prove more than the fact that Bumble thinks Match Group's Western District of Texas lawsuit is ultimately incorrect.  It must plead and prove that the lawsuit is both ***objectively baseless*** and brought in ***subjective bad faith***.

137.    Bumble cannot do so.  Despite its exceedingly high burden to show that Match's entire lawsuit is objectively baseless, Bumble did not even attempt to dismiss six of the nine claims alleged against it in the Waco Action—despite its allegations that all but one of these claims was frivolous.  This alone dooms any showing that Match's entire lawsuit is a "sham."

138.    Even if only one "objectively baseless" claim could support a business and commercial disparagement claim in this context, Bumble still could not possibly meet its high burden because no legitimate set of facts can make it plausible, much less establish, that any claim in Match's lawsuit is objectively baseless or brought in subjective bad faith.

139.    In any event, Match did not file the Western District of Texas lawsuit to attempt to acquire Bumble for a below-market price or to interfere with Bumble's valuation in any illegitimate way or to disparage Bumble as a company.  It did so because Match should not be forced to compete against its own ideas that protected by enforceable intellectual property rights.

140.    Match denies that it has published false or disparaging information about Bumble.

141.    Match denies that it published any statement with malice and ill will to harm Bumble or to interfere with Bumble's economic interests.

142.    Match denies that it published any statement about Bumble with intentional or reckless disregard for its truth.

143.    Although Bumble has sought to dismiss this claim voluntarily under Rule 41, Bumble has informed Match that it may, or it may not, file the same claim against Match again at some other time.

144.    This is precisely the situation the Declaratory Judgment Act is designed for. Match Group believes Bumble's allegations are totally and utterly baseless.  And Match Group will not simply wait until Bumble decides whether or not it wants to pursue these claims—likely in connection with Bumble's next media blitz.  Match Group intends to litigate these baseless allegations now, and Match intends to conclusively disprove them.

## TENTH COUNTERCLAIM: DECLARATORY JUDGMENT CONCERNING PROPER FORUM FOR CERTAIN DISPUTES.

145.    Bumble has also previously alleged a host of claims arising out of commercial discussions related to a potential acquisition of Bumble by Match.

146.    Bumble alleges a host of scurrilous allegations related to this process, including that Match "defrauded" Bumble into acquiring certain information, that Match has "misappropriated" certain Bumble "trade secret" information and engaged in "unfair competition" by misappropriating that information.  Bumble also brought a claim for "promissory estoppel" based on Match's alleged failure to "offer an increased bid" after requesting additional information related to the proposed transaction.

147.    Bumble has alleged that it may or may not re-file these claims and that, if it does, it may re-file them in a jurisdiction other than England and Wales.

148.    All of the information mentioned in Bumble's state court petition was disclosed to Match under a non-disclosure agreement between Match Group, Inc. and Worldwide Vision, Ltd.

149.    On information and belief, Badoo Trading Ltd. is a wholly owned subsidiary of Worldwide Vision, Ltd.  Badoo Trading Ltd. owns over 75% of Bumble Holding, Ltd.  Bumble Trading Inc., meanwhile, is a wholly owned subsidiary of Bumble Holding, Ltd.

150.    Relevant here, Section 22.2 of that agreement provides as follows: "Each party irrevocably agrees that the Courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim (including non-contractual disputes or claims) *arising out of or in connection with* this agreement or its subject matter or formation." (Emphasis added).

151.    Except for the tortious interference claim and the business and commercial disparagement claim, all of the claims Bumble alleged in its petition arise out of or in connection with the non-disclosure agreement.

152.    Bumble's "fraud" claim arises out of Bumble's allegation that Match "induced Bumble to provide its confidential information by falsely promising that they needed it to provide a higher offer."  Yet Bumble provided all of the challenged information in connection with the non-disclosure agreement between Match Group, Inc. and Worldwide Vision Ltd., which was an agreement entered into to ensure confidential discussions about a potential Bumble-related acquisition.

153.    Bumble's "Texas Uniform Trade Secrets" claim also arises out of the contract. Again, Match acquired Bumble information specifically in connection with a proposed

acquisition.  The only information alleged to be a Bumble trade secret was exchanged pursuant to the contemplated Bumble acquisition.  This claim too plainly arises from the non-disclosure agreements.

154.    Similarly, Bumble's "unfair competition" claim arises from the agreement.  That claim alleges that Match "obtained through improper means" some of "Bumble's own trade secrets and other confidential information."  In other words, Match obtained Bumble's confidential information—information disclosed to Match specifically through the terms of the non-disclosure agreement.

155.    Finally, Bumble's "promissory estoppel" claim arises from the agreement.  In that claim, Bumble alleges that it provided information because Match told Bumble that it would "shore up" or "increase" its pending offer.  Again, this is nothing more than an allegation arising out of the parties' exchange of confidential information in connection with a contemplated acquisition.

156.    While Bumble Trading Inc. and Bumble Holding, Ltd. are not formal signatories to the non-disclosure agreement, they are nevertheless bound under these circumstances by the agreement between Match Group, Inc. and Worldwide Vision Ltd.

157.    For example, Match can enforce these clauses against the Bumble entities at least because Bumble Trading, Inc. and Bumble Holding, Ltd. seek direct benefits under the agreement by seeking to enforce that agreement against Match.  Specifically, all of Bumble's allegations in its state court petition depend on the notion that the information disclosed to Match Group was confidential and/or proprietary and/or a trade secret.

158.    Of course, information that one competitor discloses to another competitor is not a trade secret simply because it is related to the competitor's business.  This is precisely why the

parties negotiated non-disclosure agreements to govern the disclosure and use of confidential information and defined the permitted uses of the information.

159.    Thus, by suing on claims depending on the notion that Match Group's use of this information was limited or that the information was confidential or proprietary, Bumble is affirmatively seeking the benefits of the agreement between Match Group, Inc. and Worldwide Vision Ltd.

160.    Given that Bumble is seeking a direct benefit of the contract, it is estopped from denying the other agreements in this contract.  This includes the exclusive selection to the jurisdiction of England and Wales to any disputes, including non-contract disputes, arising out of the non-disclosure agreement.

161.    Match is also permitted to enforce this forum selection clause against Bumble because of the relationship between Bumble Trading, Inc. and Bumble Holding, Ltd. and the signatory, Worldwide Vision Ltd.  Specifically, Worldwide Vision is a parent company to Badoo Trading Ltd.  Badoo Trading Ltd. owns the vast majority of Bumble Holding, Ltd., which owns all of Bumble Trading Inc.

162.    Bumble's claims are also closely intertwined with the contract—the contract was entered into, *inter alia*, for the specific purpose of exchanging information related to Bumble.  In these circumstances, enforcement against the non-signatory Bumble entities was not only foreseeable, it was expected.

163.    Additionally, the Worldwide Vision Ltd. agreement was drafted by Worldwide Vision on behalf of the group, which includes Bumble Trading Inc., Bumble Holding Ltd., and Badoo Trading, Ltd., and other companies affiliated with the Badoo app.  To the extent the forum selection clause is in any way ambiguous to whom among the group it would apply, that

provision should be construed against Worldwide Vision Ltd., Badoo, and Bumble as it relates to enforcement against a non-signatory.

164.    Therefore, the forum selection provision applies.

## ELEVENTH (ALTERNATIVE ONLY) COUNTERCLAIM
## (DECLARATORY JUDGMENT OF NO LIABILITY FOR MISAPPROPRIATION OF TRADE SECRETS, FRAUD, UNFAIR COMPETITION, OR PROMISSORY ESTOPPEL)

165.    Solely if the Court determines that Match cannot enforce the forum selection clause against Bumble Trading, Inc. and Bumble Holding, Ltd., Match seeks a declaration of non-liability arising out of Bumble's claims related to Match's alleged misuse of Bumble confidential information that Bumble asserted in its original state court petition.

166.    Match requested due diligence information related to a potential acquisition.  The parties ultimately could not come to an agreement on an acquisition price.

167.    The contract under which the parties conducted negotiations specifically contemplates that disclosure of particularly sensitive information "may be inappropriate." Because of this, the contract created a specific process for information designated "Highly Confidential Information."  Highly Confidential Information could be disclosed to only "outside or inside counsel for the Receiving Party" and "individuals agreed in writing by the parties and outside advisors retained by the Receiver Party," on a "need to know basis."  Information was intended to be designated "Highly Confidential Information" if it referred to or consisted of "competitively sensitive business strategy, promotional or marketing information and detailed customer and vendor information."

168.    In direct contradiction of Bumble's claims that Match has acquired particularly sensitive Bumble-related information, Bumble did not designate *any* information it disclosed to Match as "highly confidential" under the express terms of the agreement.

169.    To be clear, Match has not used any protected information disclosed in connection with the contemplated acquisition in any non-permitted way, whether designated "Highly Confidential" or not.  But the mere fact that Bumble designated nothing as particularly sensitive trade secret information highlights that Bumble's allegations here are meritless.

170.    Match specifically denies that the information that was acquired from Bumble consisted of any trade secrets because, for example, Bumble did not take reasonable steps to maintain secrecy, because the information was obtained outside of confidential discussions, or because it derived no economic value from being a secret.

171.    Match denies that it used Bumble information in any improper way.

172.    Match denies that Bumble has been proximately harmed from Match's acquisition of any Bumble-related information.

173.    Match denies that it induced Bumble to provide confidential information by falsely promising a higher offer or that any Match representation proximately caused Bumble injury.

174.    Match denies that it has committed any "illegal act" depriving Bumble of the ability to control its trade secrets and confidential information or committed any violation of the common law of unfair competition.

175.    Match denies that it promised Bumble to make a higher offer if Bumble disclosed additional Bumble-related information or that Bumble relied on any promise in disclosing that information.

176.    Match intends to vindicate itself in Court.  Match acquired Bumble information in a good faith business discussion related to a potential acquisition.  It has not misused Bumble's information; it has merely continued to compete in the online dating market, against Bumble and

others.  And, in a far-cry from its false claims alleged in its state court petition, Bumble did not indicate that any of the information was particularly sensitive.  Bumble cannot create a legal claim where none exists simply because Match did not acquire Bumble at Bumble's preferred price.

## PRAYER FOR RELIEF

**WHEREFORE,** Defendant prays for the entry of a judgment from this Court:

1.      Judgment in Defendant's favor and against Plaintiffs on all counterclaims and defenses alleged herein;

2.      A preliminary and/or permanent injunction restraining Plaintiffs, and their agents, servants, employees, attorneys, successors and assigns, and all persons, firms, and corporations acting in concert with them, from directly or indirectly violating Defendant's utility patent rights or design patent rights;

3.      A declaratory judgment that Bumble infringes the '811 Patent;

4.      A declaratory judgment that the '811 Patent is subject matter eligible under 35 U.S.C. § 101.

5.      A declaratory judgment that Bumble infringes the '314 Patent.

6.      A declaratory judgment that the '314 Patent is non-functional.

7.      A declaratory judgment that Bumble infringes the '023 Patent;

8.      A declaratory judgment that the '023 Patent is subject matter eligible under 35 U.S.C. § 101.

9.      A declaratory judgment that Match's conduct in connection with a potential acquisition of Bumble did not give rise to liability for tortious interference with prospective business relations.

10.     A declaratory judgment that Match's conduct in connection with a potential acquisition of Bumble did not give rise to liability for business and commercial disparagement.

11.     A declaratory judgment that Bumble is bound by the forum selection clause in the non-disclosure agreement between Match Group, Inc. and Worldwide Vision Ltd., and that the claims related to alleged misuse of information disclosed to Match in connection with a potential acquisition of Bumble fall within the scope of the clause.  Solely in the alternative, a declaratory judgment that Match has not misused Bumble confidential information in any way, and its course of conduct in connection with a potential acquisition of Bumble does not give rise to liability for misappropriation of trade secrets, fraud, unfair competition, or promissory estoppel.

12.     For damages in an amount to be further proven at trial, including:

    a.  Damages under 35 U.S.C. § 284, including enhancement and including supplemental damages for any continuing post-verdict infringement up until entry of final judgment, with an accounting, as needed;

    b.  Damages under 35 U.S.C. § 289, including Bumble's total profit and revenue realized and derived from its infringement of the '314 Patent and in an amount not less than a reasonable royalty.

13.     For Defendant's reasonable attorney's fees;

14.     For costs of suit incurred herein, including all disbursements;

15.     For pre-judgment and post-judgment interest on the damages awarded;

16.     If an injunction is not granted, that Defendant be awarded an ongoing licensing fee; and

17.     For such other and further relief (including any and all equitable relief) as the Court may deem to be just and proper.

## DEMAND FOR JURY TRIAL

Defendant demands a trial by jury on all issues triable of right by a jury.

Dated: November 1, 2018

Respectfully submitted**,**

CALDWELL CASSADY CURRY P.C.


/s/ *Bradley W. Caldwell*
Bradley W. Caldwell
Texas State Bar No. 24040630
Email:  bcaldwell@caldwellcc.com
John F. Summers
Texas State Bar No. 24079417
Email: jsummers@caldwellcc.com
CALDWELL CASSADY CURRY P.C.
2101 Cedar Springs Road, Suite 1000
Dallas, Texas 75201
Telephone: (214) 888-4848
Facsimile: (214) 888-4849


Marc Wolinsky (*Admitted Pro Hac Vice*)
Stephen R. DiPrima (*Admitted Pro Hac Vice*)
Nathaniel D. Cullerton (*Admitted Pro Hac Vice*)
Jonathan Siegel (*Admitted Pro Hac Vice*)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Telephone:  212-403-1000
Facsimile:  212-403-2000

**ATTORNEYS FOR
MATCH GROUP, LLC**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 1, 2018 a copy of the foregoing documents was served upon all counsel of record through the Court's CM/ECF system.

<u>/s/ *Bradley W. Caldwell*</u>